## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA

|  |  |
|---|---|
| **STEPHANIE ROMERO, DAVID STARNES, STACI FOOTE, ASHLEY LILL,** and **CRYSTAL FABELA**, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> **MIDWESTERN PET FOODS, INC**., <br><br> Defendant. | **CLASS ACTION COMPLAINT** <br><br> JURY TRIAL DEMANDED <br><br> No. 3:21-cv-00014 |

Plaintiffs Stephanie Romero, David Starnes, Staci Foote, Ashley Lill and Crystal Fabela (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated (collectively, the "Class," as more fully defined below), bring this class action complaint against Defendant Midwestern Pet Foods, Inc. ("Midwestern" or "Defendant"). Plaintiffs make the following allegations upon personal knowledge as to their own acts, upon information and belief, and their attorneys' investigation as to all other matters, alleging as follows:

### I.    NATURE OF THE ACTION

1.    On December 30, 2020, the U.S. Food and Drug Administration (the "FDA") along with Midwestern Pet Foods issued a notice of a recall of nine lots of SPORTMiX brand pet foods ("SPORTMiX") after the Missouri Department of Agriculture found them to contain very high, potentially *fatal* levels of aflatoxin, a mold, that can cause sickness and death to pets (the "Recall"). The FDA reported at that time that 28 dog died after eating the SPORTMiX pet foods.

1

2.      Less than two weeks later on January 11, 2021, the FDA and Midwestern announced an expanded Recall of all its products containing corn from its Oklahoma manufacturing facility including SPORTMiX, Pro Pac Originals, Splash, Sportstrail, and Nunn Better (the "Recalled Pet Foods") with an expiration date on or before July 9, 2022 – which is over **1,000 lot codes affected**.[1] The FDA stated it has received estimated reports of **at least 70 dogs that have now died** from eating the pet foods and **80 that have become ill**, which does not include those not reported to the FDA or that are directed to Midwestern.

3.      The FDA cautions pets are highly susceptible to aflatoxin poisoning because they generally eat the same food continuously over extended periods of time. If a pet's food contains aflatoxins, the toxins could accumulate in the pet's system as a result.

4.      According to the FDA, pets with aflatoxin poisoning may experience symptoms such as sluggishness, loss of appetite, vomiting, diarrhea, and/or jaundice (yellowish tint to the eyes, gums or skin due to liver damage). This toxicity may cause long-term liver issues even in pets who do not show symptoms. The FDA warns that aflatoxin poisoning can cause death.

5.      A veterinarian, who published laboratory test results for some samples of the Recalled Pet Foods found that they measured 525 parts per billion (ppb) in one pet food sample and 380 (ppb) in the other – far surpassing the FDA's legal limit of 20 ppb by 19 and 26 times according to the Canine Review.

---

[1] Specifically, the products subject to the Recall as of January 11, 2021 are: Pro Pac Adult Mini Chunk, Pro Pac Performance Puppy, Splash Fat Cat 32%, Nunn Better Maintenance, Sportstrail 50, Sportmix Original Cat 15, Sportmix Original Cat 31, Sportmix Maintenance 44, Sportmix Maintenance 50, Sportmix High Protein 50, Sportmix Energy Plus 44, Sportmix Energy Plus 50, Sportmix Stamina 44, Sportmix Stamina 50, Sportmix Bite Size 40, Sportmix Bite Size 44, Sportmix High Energy 44, Sportmix High Energy 50, Sportmix Premium Puppy 16.5, Sportmix Premium Puppy 33. The identified lots containing corn potentially contaminated with aflatoxin are identified by "05" to signify they are from the Company's Oklahoma facility.

6.      On December 25, 2020, Christmas day, after Ms. Romero had been feeding her two dogs SPORTMiX pet food, the two dogs became seriously ill consistent with symptoms of aflatoxin poisoning, and Ms. Romero was forced to make the decision to euthanize them.

7.      After feeding three of his dogs SPORTMiX, Mr. Starnes's three dogs died on December 4, December 6 and December 10, 2020, after becoming suddenly ill and appearing jaundiced. His dog that did not eat as much SPORTMiX is the only survivor.

8.      During November and December 2020, Ms. Foote fed her three dogs SPORTMiX. Two of her dogs began vomiting and having diarrhea. On January 6, 2021, one of her dogs became jaundiced, was diagnosed with aflatoxin poisoning, and Ms. Foote had to make the decision to euthanize her.

9.      After feeding her two dogs SPORTMiX from a bag purchased in October 2020, one of Ms. Lill's dogs began vomiting and when she switched her pet food, the dog recovered. Her other dog continued to eat SPORTMiX, became jaundiced, had diarrhea, and died on December 20, 2020, on the way to the veterinarian's office.

10.     When Ms. Fabela fed her four dogs SPORTMiX, all four became ill and required veterinary care, including overnight hospitalization for one.

11.     Pet foods are considered adulterated under state and federal law if they contain a poisonous substance. Adulterated pet foods are prohibited from being sold.

12.     Midwestern is an Indiana company headquartered in Evansville, Indiana that has manufactured different brands of pet foods since 1926. Its pet foods are sold by retailers online and in stores nationwide.

13.     Midwestern advertises its pet foods as "100% Guaranteed for Taste and Nutrition" and that "if you are not satisfied for any reason, you can return the product with the packaging and receipt to the retailer."

14.     Furthermore, prior to the Recall and before Plaintiffs alerted Defendant to its potential violations of law, to further bolster the image of its pet foods as healthy for pets, Midwestern touted only selecting the highest quality ingredients and testing and re-testing to ensure the health and safety of pets eating Defendant's pet foods. Midwestern stated that it relied upon testing by the suppliers of its ingredients, its own testing of ingredients upon receipt at its facilities and testing of the final products. After Plaintiffs alerted Defendant to these misrepresentations, they were removed from Defendant's websites.

15.     As a result of Defendant's misrepresentations of its pet food as "100% guaranteed for taste and nutrition" that is tested to ensure the health and safety of pets, reasonable consumers purchased the Recalled Pet Foods and paid a particular price for them without knowing the significant risk of aflatoxin poisoning from Defendant's inadequate testing.

16.     Consumers of the Recalled Pet Foods—including Plaintiffs and the other Class members—paid a premium for them, based on Defendant's representations that they are "100% guaranteed for taste and nutrition" that are tested to ensure the safety and health of pets that consumed Defendant's pet foods compared to other products. Defendant, however, misrepresented or omitted the risk of sickness and even death from aflatoxin contamination.

17.     Defendant's omission of critical information from the Class members is further demonstrated by its insurance claims process that attempts to "buy off" certain Class members through a faulty, burdensome claims process that requires evaluation by a veterinarian and toxicologist and substantial documentation. Furthermore, existence of the claims process has not

been made public or publicized with notice of the Recall, and the Recall has omitted any information about refunds for purchases of the Recalled Pet Foods. This attempt to buy silence has likely negatively impacted other consumers and Class members.

18.     Every consumer, who purchased the Recalled Pet Foods without being informed of the true facts about their health and safety risks prior to purchase was injured at the point of sale when, instead of obtaining a "100% guaranteed for taste and nutrition" pet food that was tested for the health and safety of pets that consume it, the consumers obtained Defendant's unreasonably dangerous and defective product that was not properly tested.

19.     Further, many consumers who purchased the Recalled Pet Foods experienced or will experience consequential damages for pets damaged by aflatoxin poisoning including veterinary care, such as life-long liver damage, that will require ongoing veterinary care. Many consumers who purchased the Recalled Pet Foods also lost pets who succumbed to the poisoning and those consumers incurred veterinary bills for end-of-life care as well as losing the value of their pets. These damages all result from the Recalled Pet Foods' undisclosed safety issues.

20.     By misrepresenting the "100% guaranteed for taste and nutrition" pet food that is tested for the health and safety of pets and omitting and failing to disclose the dangers that Recalled Pet Foods pose to pets including being potentially fatal, Defendant defrauded Plaintiffs and the other Class members, deprived them of the benefit of their bargain, and/or was unjustly enriched at Plaintiffs' and the other Class members' expense. Plaintiffs, individually and on behalf of the other Class members they seek to represent, seek monetary damages, statutory penalties, and injunctive relief as set forth herein.

21.     Prior to the filing of this lawsuit, Plaintiffs alerted Midwestern to its violations of law and misrepresentations on January 12, 2021 via letter, attached as Exhibit A, and on January

13, 2021, through a telephone call. Plaintiff demanded that Midwestern take every action in its power to notify its customers who, even after the January 11, 2021 expanded recall notice, were unwittingly poisoning their dogs because they had not heard about the Recall. Subsequently, Midwestern removed certain representations from its websites as of January 14, 2021, including all references to Midwestern's testing of its ingredients and pet foods for the safety and the health of pets.[2] On January 15, 2021, Plaintiffs spoke again with Midwestern and sent a second notice and demand letter. Plaintiffs raised the issue of pet owners continuing to feed the poisonous food to dogs even after the January 11, 2021 expanded recall and inquired as to what actions Midwestern was taking to prevent future harm. Midwestern's representative did not identify any.

## II.    JURISDICTION AND VENUE

22.    Jurisdiction is proper in this Court pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because at least one Class member is of diverse citizenship from the Defendant, there are more than 100 Class members, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs. This Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

23.    This Court has personal jurisdiction over Defendant because Defendant is incorporated and headquartered in the State of Indiana. Some, if not most, of the actions giving rise to the Complaint took place in this District, including but not limited to Defendant's oversight of manufacturing, distribution, advertising and representations regarding the Recalled Pet Foods, and Defendant's pet food websites' terms designate Indiana law and courts. Most, if not all, of

---

[2] *See, e.g.*, SPORTMiX, FAQ Wayback Machine as of Dec. 31, 2020, https://web.archive.org/web/20201231160949/https://www.sportmix.com/faq/ (last visited Jan. 18, 2020); Pro Pac, FAQ Wayback Machine as of Oct. 27, 2020, https://web.archive.org/web/20201027175941/https://www.propacultimates.com/faq/ (last visited Jan. 17, 2021).

Plaintiffs' claims arise out of Defendant operating, conducting, engaging in, or carrying on a business or business venture in this State, or having an office or agency in this State, committing a tortious act in this State, and causing injury to property in this State arising out of Defendant's own acts and omissions in this State. At or about the time of such injuries, Defendant was engaged in solicitation or service activities within this State, or else products, materials, or things processed, serviced, or manufactured by Defendant anywhere were used or consumed within this State in the ordinary course of commerce, trade, or use.

24.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), because a substantial part of the events or omissions giving rise to these claims occurred in this District, upon information and belief, Defendant has caused harm to Class members residing in this District, and Defendant is a resident of this District under 28 U.S.C. § 1391(c)(2), because it is subject to personal jurisdiction in this District.

### III.    PARTIES

*Plaintiffs*

25.     Plaintiff **Stephanie Romero** is a resident and citizen of the State of New Mexico, residing in Las Vegas, New Mexico. Ms. Romero was a regular purchaser of SPORTMiX pet foods for her dogs, Scotty and Olive.

26.     Ms. Romero resides in Las Vegas, New Mexico with her husband and her son who was 11 years old at the time of the events in question. She regularly purchased SPORTMiX dog food over the course of several years. She most recently purchased SPORTMiX on December 15, 2020, she purchased two 50-pound bags of SPORTMiX High Energy dog food from Tractor Supply in Las Vegas, New Mexico. Ms. Romero viewed Defendant's packaging and materials before her purchase, which stated that SPORTMiX was "100% guaranteed for taste and nutrition,"

7

and did not disclose any risk of aflatoxin poisoning. Ms. Romero would not have given SPORTMiX to her pets, or would have paid significantly less for it, if Defendant had not misrepresented its pet food and had disclosed such risks.

27.     Ms. Romero fed SPORTMiX to Olive, a Labrador mix, age 3; and Scotty, a dachshund, age 3. Scotty is pictured below on the grass and Olive is on Ms. Romero's shoulder.



28.     Around December 16, 2020, Ms. Romero observed that Olive was less active than normal. Around December 23, 2020, Olive had decreased appetite and was vomiting. On December 25, 2020, Ms. Romero witnessed Olive having two seizures, including in her crate; Olive's vomit contained blood; and Olive was very lethargic, disoriented and confused. Ms. Romero saw that Olive was jaundiced, and she uncharacteristically peed in the house, which let Ms. Romero see that her urine was bright orange. Ms. Romero reached Olive's vet, Dr. Jantzen, who agreed to meet her and Olive at the clinic immediately on Christmas Day.

29.     Dr. Jantzen advised Ms. Romero that Olive had been poisoned, her organs were shutting down, her chances of survival were low, she was suffering, and letting her pass naturally would prolong the pain she was in. Ms. Romero and her 11-year-old son decided to euthanize

Olive, which happened even before Ms. Romero's husband, an on-duty New Mexico State Trooper, was able to arrive to say goodbye to Olive.

30.     Ms. Romero and her son returned home with the paperwork to cremate Olive and to attend to Scotty, the dachshund. Approximately one week before Christmas, Scotty seemed less active and lethargic but was still somewhat active and in good spirits. When Ms. Romero returned home from euthanizing Olive, Scotty's abdomen was distended, he was vomiting, he was very weak, and a puddle of dark blood was on the floor next to him. She rushed Scotty to the vet. Dr. Jantzen advised that Scotty was bleeding internally and needed to be euthanized. Ms. Romero and her son made arrangements for Scott's cremation.



31.     Several days later, Ms. Romero learned of the Recall. She matched the lot code on her bag to the Recall notice. She promptly alerted her vet and filed reports with the FDA for both Olive and Scotty. She also returned to Tractor Supply and told the manager that her dogs had died from eating the recalled SPORTMiX food. The manager told Ms. Romero that the store was not obligated to contact customers.

32.     Ms. Romero contacted Midwestern after learning of the Recall and had not heard anything back before she retained counsel. Counsel for Ms. Romero sent the Company a letter on January 12, 2021, on behalf of Ms. Romero and all other Recalled Pet Food customers. In response, a claims investigator of Midwestern's insurance company reached out to Counsel for Ms. Romero and indicated that she would need to provide information including veterinarian bills and records, permission for Midwestern to speak to her vet, any toxicology testing, autopsy information and receipts or other proof of purchase of the Recalled Pet Foods. Counsel for Ms. Romero followed up again with the company and spoke to Counsel for Midwestern on January 15, 2021. At the time of that call, Counsel for Midwestern did not provide a settlement offer to Ms. Romero.

33.     Plaintiff **David Starnes** is a resident and citizen of the State of Oklahoma, residing in Oklahoma with his wife and young child. He regularly purchased SPORTMiX dog food over the course of several years. Before their initial purchase of SPORTMiX, the Starnes researched SPORTMiX online, including reading reviews. In the last week of November 2020, they opened a bag of SPORTMiX that they had recently bought from Chewy.com for $35.99.

34.     Mr. Starnes viewed Defendant's packaging and materials before his purchase, which stated that SPORTMiX was "100% guaranteed for taste and nutrition," and did not disclose any risk of aflatoxin poisoning. Mr. Starnes would not have given SPORTMiX to his pets, or would have paid significantly less for it, if Defendant had not misrepresented its pet food and had disclosed such risks. One of the recent purchases of SPORTMiX High Energy 50 contained lot code 03/30/22/05/L3/B170 12:57. Pictured here is Avery, one of the Labradors.



35.     Mr. Starnes fed this to the family's three Labradors: Chloe, age 11, a retired hunting dog; Avery, approximately age 5; and Hazel, age 3. On December 4, 2020, around 11 p.m., Mr. Starnes let the dogs outside and when the dogs came back in, Avery could barely walk to the door or stand, and they noticed that her eyes were jaundiced. She had been fine earlier that day, but Avery had also been the most eager to eat SPORTMiX. Mr. Starnes and his wife attended to Avery by checking on her several times overnight. She was alive at 4:30 a.m. Mr. Starnes intended to take her to the vet first thing in the morning, but Avery was dead by 7 a.m. Instead, Mr. Starnes buried Avery.

36.     Around mid-afternoon on December 6, 2020, Mr. Starnes noticed that Hazel had also became sick and took her to the vet where they learned that she was experiencing liver failure. Hazel spent the night at the veterinarian's office and passed away there.

37.     A few days after losing Hazel, Chloe refused to eat the SPORTMiX food. The Starnes researched the food online and did not find any information to alert them to any problems with SPORTMiX. At this time, no recall had been issued, and Mr. Starnes did not yet suspect the

food as causing his pets' deaths. He understandably thought that Chloe's refusal to eat was due to her mourning the loss of her companions, so Starnes put chicken broth on the food to encourage Chloe to eat, and then she consumed more of the SPORTMiX. Then Chloe also visited the vet and died on December 10, 2020. The vet suspected poisoning for all three dogs. Oakley, the family's remaining Labrador, refused to eat the food and is still alive.

38.    At the end of December, weeks after his three Labradors had passed, Starnes learned of the SPORTMiX Recall. He matched the lot code on his bag to the Recall notice. He posted on Facebook to alert others about the Recall. Mr. Starnes contacted Midwestern and a representative told him his bag was not part of the Recall. He then contacted counsel.

39.    Plaintiff **Staci Foote** resides in Valley Center, Kansas with her spouse and two children. She had been buying SPORTMiX dog food since approximately 2017 and starting in approximately January 2020, began purchasing from Chewy.com. She visited Midwestern's website frequently and even proactively checked for recall notices over the last several years. Ms. Foote viewed Defendant's packaging and materials before her purchase, which stated that SPORTMiX was "100% guaranteed for taste and nutrition," and did not disclose any risk of aflatoxin poisoning. Ms. Foote would not have given SPORTMiX to her pets, or would have paid significantly less for it, if Defendant had not misrepresented its pet food and had disclosed such risks. On November 7, 2020, she purchased SPORTMiX Premium High Energy 26/18, a 50-pound bag, for $35.99 plus shipping from Chewy.com. One of the recent purchases contained lot code 05/L2 & 05/L3 Best By Date: 03/02/22 & 03/03/22.

40.    Ms. Foote fed Sportmix to her family's three dogs: Tucker, a dachshund, age 7; Quinn, a border collie, age 3; and Zoe, a border collie, age 6. Zoe is pictured below with Ms. Foote's children, plus Zoe with a tennis ball.

 

41.    On Thanksgiving 2020, Quinn became very picky about the food and would not continue to eat it. Quinn vomited and had diarrhea. Ms. Foote stopped feeding SPORTMiX to Quinn. Tucker continued to eat SPORTMiX until approximately the end of December 2020, but he too had vomiting and diarrhea. Zoe, however, continued to scarf down the SPORTMiX. She too, then stopped eating it and Ms. Foote's husband went to purchase a different food between Christmas and New Year's. About one day after deciding to purchase a different food, Ms. Foote learned of the Recall. A few days later, around December 31, 2020, she also received notification from Chewy.com regarding the Recall and called them immediately. She also notified friends who had potentially purchased the Recalled Pet Food. On January 4, 2021, Zoe started acting strangely, so on January 5, 2021, she went to the vet and was sick enough that the vet kept her overnight. On

January 6, 2021, Zoe was jaundiced, diagnosed with aflatoxin poisoning, euthanized, and cremated.

42.     Plaintiff **Ashley Lill** resides in Wichita, Kansas with her spouse and four children. On October 25 and November 27, 2020, she purchased SPORTMiX High Energy dog food from Chewy.com. She paid $35.99 per bag. Ms. Lill viewed Defendant's packaging and materials before her purchase, which stated that SPORTMiX was "100% guaranteed for taste and nutrition," and did not disclose any risk of aflatoxin poisoning. Prior to purchasing the food, Ms. Lill and her spouse had researched the food to find the right nutritional profile for their dogs. Ms. Lill would not have given SPORTMiX to her pets, or would have paid significantly less for it, if Defendant had not misrepresented its pet food and had disclosed such risks. The bag purchased in October contained lot code 03/03/22/05/L3 and an expiration date of 037/MAR/2022/05, pictured below along with Lulu, the dog that it killed.



43.     Lill fed SPORTMiX to her family's two dogs: Bella, a Boston terrier, age 1; and Lulu, a pit bull rescue, age 3½. When eating from the October bag, Bella started vomiting, Ms. Lill switched Bella to eating a different food for sensitive stomachs, and Bella stopped vomiting within two days. Lulu continued to eat SPORTMiX. On the evening December 19, 2020, Ms. Lill noticed that Lulu was moving slowly. On December 20, 2020, Lulu was not acting right about 7

a.m. Ms. Lill was away from home when the sitter called around 10 a.m. to alert her that Lulu's eyes were yellow and dilated and Lulu was outside lying on the grass, which was not normal for Lulu. Ms. Lill's husband promptly returned home to take Lulu to the veterinarian's office. By then, Lulu had brown fluid coming out of her mouth and her rear end. Lulu was also gasping for air. She died before noon on her way to the veterinarian. The veterinarian suspected poison. At the time of Lulu's death, SPORTMiX had not been recall. On December 30, 2020, Ms. Lill's brother-in-law alerted her to the Recall.

44.     Plaintiff **Crystal Fabela** resides in Amarillo, Texas with her spouse and two children. She purchased two, 50-pound bags of Sportmix High Protein 27-12 for $25.99 per bag, at Rancher's Supply in Amarillo on January 4, 2021. Ms. Fabela viewed Defendant's packaging and materials before her purchase, which stated that SPORTMiX was "100% guaranteed for taste and nutrition," and did not disclose any risk of aflatoxin poisoning. Rancher's Supply recommended SPORTMiX. Ms. Fabela would not have given SPORTMiX to her pets, or would have paid significantly less for it, if Defendant had not misrepresented its pet food and had disclosed such risks.

45.     Ms. Fabela fed Sportmix to her family's four dogs: Luna, a 4-month-old Labrador retriever; Baxter, a 6-month-old standard poodle; Daisy, a 4-year-old teacup Yorkshire terrier; and Sky, a 2-year-old teacup Yorkshire terrier-Maltese mix. The bag from which Ms. Fabela was feeding her dogs, pictured below, was recalled shortly after she bought it. Sky, who spent two nights hospitalized from eating from that bag in January 2021, is pictured below.



46.     Luna got sick first, but eventually all four required medical attention and bloodwork, including an overnight stay for Sky. Even as of January 14, 2021, the day she visited the vet, the vet did not know about the Sportmix recall. Ms. Fabela learned of the recall from the television news and informed her vet. If not for the news report, Ms. Fabela would have continued to feed Sportmix until her dogs were dead. The dogs suffered prolonged diarrhea and, according to the vet, have liver damage.

### *Defendant*

47.     Defendant Midwestern is an Indiana corporation, headquartered in Evansville, Indiana with four facilities located across the country. Midwestern manufactures, distributes, markets, and sells pet food from its Indiana headquarters, including the Recalled Pet Foods, to consumers through retailers online and in stores across the United States from its Indiana headquarters. On the websites for its pet foods in its terms and conditions, Midwestern designates Indiana law and courts as its choice of law and forum for any disputes.

## IV.      COMMON FACTUAL ALLEGATIONS

**A.      Midwestern Advertises the Recalled Pet Foods as "100% Guaranteed for Taste and Nutrition" that are Tested and Re-Tested to Ensure Pets' Health and Safety.**

48.      Midwestern purports to be a family-run operation headquartered in Evansville, Indiana, with four state-of-the-art manufacturing facilities. It touts only selecting the highest quality ingredients from trusted sources to be used in its pet foods.

49.      In fact, the Company advertises its SPORTMiX, Pro Pac and Nunn Better as "100% guaranteed for taste and nutrition" promising customers a refund if they are not satisfied with the product including on the Company's websites[3] for their products:

> Is there a satisfaction guarantee?
>
> All SPORTMiX products are 100% guaranteed for taste and nutrition. If you are unsatisfied for any reason, simply return any unused food along with the bag and receipt to the authorized retailer where it was purchased for a full refund or exchange. Ask your retailer for details.

---

[3] *See, e.g.,* SPORTMiX, FAQ, https://www.sportmix.com/faq/ (last visited Jan. 17, 2021); SPORTMiX, Premium Puppy Small Bites, https://www.sportmix.com/dog-food/premium-formulas/puppy-small-bites/; Pro Pac, https://www.propacultimates.com/ (last visited Jan. 17, 2021); Nunn Better, https://www.nunn-better.com/dog-food (last visited Jan. 17, 2021).



Welcome to SPORTMiX® / Food for Dogs and Puppies / Premium Formulas / Puppy Small Bites

# Puppy Small Bites

Share ⓕ

**SPORTMiX® Puppy Small Bites** 28/20 is formulated for puppy's first full year of growth. This nutrient-rich formula with chicken and fish protein, combined with a high level of vitamins and minerals, promotes development of bones, teeth and muscles during this rapid stage of growth. Balanced Omega-6 and Omega-3 fatty acids promote healthy skin and beautiful coat. SPORTMiX® Puppy Small Bites supplies your growing, active puppy with 100% complete and balanced nutrition and provides a taste that puppies love. SPORTMiX® Puppy Small Bites is naturally preserved and 100% guaranteed for taste and nutrition. SPORTMiX® Puppy Small Bites Puppy Food is formulated to meet the nutritional levels established by the AAFCO Dog Food Nutrient Profiles for lactation/gestation and growth of dogs. Available in 33 and 16.5 lb. bags.



Where to Buy





Home  /  Dog Food

## Dog Food

You won't find a better selection of domestic pet foods anywhere and all of our Nunn-Better pet food items are made right here in the USA at our own plants using ingredients sourced in the USA. There is a Nunn-Better dog food for all types of dogs and they are all tasty, nutritious, and easily digestible. Nunn-Better dog food products are naturally preserved, 100% guaranteed, and have a great taste your dog will love.  High quality ingredients combined with vitamins and minerals provide your dog with complete and balanced nutrition.








Mini Chunks        Crunchy Bites        High Protein        Hunter's Select Maintenance        Hunter's Select High Energy

50.    Defendant's representation that its pet foods are "100% guaranteed for taste and nutrition" is also displayed on the SPORTMiX, Pro Pac and Nunn Better packaging that consumers view before purchasing their pet foods:















 

51.     Prior to the Recall, Midwestern also touted the safety of its products for the pets that consume them including highlighting the testing performed on its ingredients and final products by suppliers and Midwestern including on the Pro Pac website below:

**ultimates**

**QUALITY AND SAFETY**

**What safety and quality control measures are used by Midwestern Pet Foods?**

Midwestern Pet Foods has quality control personnel and laboratories at each plant to test incoming ingredients and finished products. This ranges from managing guarantees, to testing things like degree of cook and microbial confirmation for release. All of our plants are FSMA-ready and follow the GMP regulations as put out through FSMA and the FDA. Additionally, all of our safety technicians follow all OSHA and state regulations.

**Which PRO PAC Ultimates foods meet AAFCO requirements?**

All PRO PAC Ultimates foods are designed to provide complete and balanced nutrition and meet Association of American Feed Control Officials (AAFCO) requirements.

**What testing is done beyond AAFCO trials?**

Midwestern Pet Foods conducts a variety of comprehensive food safety-related tests and studies, including salmonella, ebac, clostridium, plate count, etc., as well as numerous digestive and stability related studies.

**Are animals tested in laboratories?**

Midwestern Pet Foods is committed to the humane treatment of all animals and does not test on animals in laboratories. When introducing a new product, Association of American Feed Control Officials (AAFCO) feeding trials are completed at a farm with an in-home atmosphere that is non-invasive, non-lethal and cage-free. All animals are humanely treated.

**Are there any current recalls?**

No, Midwestern Pet Foods has an unblemished safety record, never having had a product recall.

**INGREDIENTS**

**Do these products contain artificial flavors, preservatives, or colors?**

No, PRO PAC Ultimates recipes use only the best natural ingredients.

**Are ingredients tested?**

With the health and safety of your pet in mind, we choose only ingredient sources we can trust. All ingredients used in our PRO PAC Ultimates products are thoroughly tested and undergo many checkpoints to ensure safety and quality standards are met. First, suppliers run a multitude of tests before sending any ingredients to our manufacturing facilities. Next, the ingredients are typically tested as they arrive at our manufacturing plant before they are accepted and unloaded from their shipping containers. Lastly, finished product is tested again. In our long history Midwestern Pet Foods has an unblemished safety record, never having had a product recall.

**Are there ingredients from China in this food?**

Midwestern Pet Foods sources all ingredients from US suppliers whenever possible. Some examples of ingredients that must be sourced outside the US are lamb meal from Australia or New Zealand, tapioca from Vietnam and Thailand and flaxseed from Canada. Vitamin premixes are formulated, sourced and blended in the United States by a US company in a human grade facility. All ingredients are thoroughly tested and undergo many quality checks to ensure safety.

52.    Similarly, the SPORTMiX website also included representations about the testing performed on the ingredients and products to ensure the safety and health of the animals that consume them[4]:

---

[4] After being alerted to the misrepresentations by Plaintiffs, Midwestern removed its statements regarding testing of its ingredients and products for health and safety. SPORTMiX, FAQ Wayback Machine as of Dec. 31, 2020, https://web.archive.org/web/20201231160949/https://www.sportmix.com/faq/ (last visited Jan. 17, 2021).

## QUALITY AND SAFETY

### What safety and quality control measures are used by Midwestern Pet Foods?

Midwestern Pet Foods has quality control personnel and laboratories at each plant to test incoming ingredients and finished products. This ranges from managing guarantees, to testing things like degree of cook and microbial confirmation for release. All of our plants are FSMA-ready and follow the GMP regulations as put out through FSMA and the FDA. Additionally, all of our safety technicians follow all OSHA and state regulations.

### Which SPORTMiX foods meet AAFCO requirements?

All SPORTMiX foods are designed to provide complete and balanced nutrition and meet Association of American Feed Control Officials (AAFCO) requirements.

### What testing is done beyond AAFCO trials?

Midwestern Pet Foods conducts a variety of comprehensive food safety-related tests and studies, including salmonella, ebac, clostridium, plate count, etc., as well as numerous digestive and stability related studies.

### Are animals tested in laboratories?

Midwestern Pet Foods is committed to the humane treatment of all animals and does not test on animals in laboratories. When introducing a new product, Association of American Feed Control Officials (AAFCO) feeding trials are completed at a farm with an in-home atmosphere that is non-invasive, non-lethal and cage-free. All animals are humanely treated.

### Are there any current recalls?

No, Midwestern Pet Foods has an unblemished safety record, never having had a product recall.

## INGREDIENTS

### Are ingredients tested?

With the health and safety of your pet in mind, we choose only ingredient sources we can trust. All ingredients used in our SPORTMiX products are thoroughly tested and undergo many checkpoints to ensure safety and quality standards are met. First, suppliers run a multitude of tests before sending any ingredients to our manufacturing facilities. Next, the ingredients are typically tested as they arrive at our manufacturing plant before they are accepted and unloaded from their shipping containers. Lastly, finished product is tested again. In our long history Midwestern Pet foods has an unblemished safety record, never having had a product recall.

### Are there ingredients from China in this food?

Midwestern Pet Foods sources all ingredients from US suppliers whenever possible. Some examples of ingredients that must be sourced outside the US are lamb meal from Australia or New Zealand and flaxseed from Canada. Vitamin premixes are formulated, sourced and blended in the United States by a US company in a human grade facility. All ingredients are thoroughly tested and undergo many quality checks to ensure safety.

24



53.     Defendant knew that customers would view these representations, including that Defendant's pet foods were guaranteed to be nutritious and safe for their pets to eat, when deciding whether to purchase the Recalled Pet Foods.

54.     However, Defendant failed to properly test its ingredients and products in order to "100% guarantee" that they are nutritious and safe for pets to eat. While Defendant knew of these misrepresentations and risks, it never disclosed them to consumers. Defendant knew that because of these undisclosed risks and misrepresentations about its products, it was depriving consumers of the ability to make an informed decision as to whether to purchase the Recalled Pet Foods.

55.     Plaintiffs and Class members purchased the Recalled Pet Foods without having a full understanding of the real, material, and potentially deadly risks their pets faced by consuming the Recalled Pet Foods.

56.     Defendant' misrepresented that the Recalled Pet Foods are "100% guaranteed for taste and nutrition" and have been tested for health and safety and failed to disclose material information about the risk to pets who consumed them including causing injury to—and the deaths

of—some of these pets. Defendant's misrepresentations and failure to disclose the material risks with the Recalled Pet Foods—its conscious decision to misrepresent and omit those facts from its disclosures to consumers—was unconscionable and demonstrated a reckless indifference to Plaintiffs, Class members, and their pets.

57.    As a result of Defendant's failure to fully disclose the risks associated with the Recalled Pet Foods as a warning to consumers and continued misrepresentations that they are "100% guaranteed for taste and nutrition" and tested for safety to pets that consume them, consumers suffered and continue to sustain damages resulting from Defendant's misconduct.

58.    Plaintiffs and members of the proposed Classes have suffered injury as a result of Defendant's concealment, misrepresentations and/or deceptive and unfair trade practices, and are entitled to relief.

59.    Had Defendant disclosed the truth about the Recalled Pet Foods, Plaintiffs and the other Class members would have been aware of them and would not have purchased the Recalled Pet Foods, or would not have paid the price that they paid for them. In the future, if Defendant truthfully represented the Recalled Pet Foods and disclosed the risks, Plaintiffs and others would be in a position to make an informed decision as to whether to purchase the Recalled Pet Foods at the prices offered.

60.    Plaintiffs and the other Class members did not receive the benefit of their bargain with Defendant. Rather, they purchased products that are of a lesser standard, grade, and quality than represented, with undisclosed health and safety risks, or a lack of warning of the same. Plaintiffs and the other Class members did not receive products that met ordinary and reasonable consumer expectations regarding safety and efficacy.

**B.    After Dozens of Pets Die and Become Ill, the FDA and Defendant Announce the Recall of Pet Foods.**

61.     Despite representing Midwestern pet foods to be "100% guaranteed for taste and nutrition" that are tested to ensure pets' health and safety, on December 30, 2020, Midwestern Pet Foods and the FDA first announced a recall of certain lots of SPORTMiX pet food products after the FDA was alerted that at least 28 dogs had died and eight were ill after consuming the recalled SPORTMiX pet food. [5]

62.     The FDA reported that the Missouri Department of Agriculture found samples of SPORTMiX pet foods to contain very high levels of aflatoxins. Aflatoxins are toxins produced by the mold Aspergillus flavus that grow on corn and other grains used as ingredients in pet food. [6]

63.     At high levels, aflatoxins can cause illness and death in pets even if there is no visible mold. Pets experiencing aflatoxin poisoning may have symptoms such as sluggishness, loss of appetite, vomiting, jaundice (yellowish tint to the eyes or gums due to liver damage), and/or diarrhea. In severe cases, this toxicity can be fatal. In some cases, pets may suffer liver damage but not show any symptoms. [7]

64.     Although there have not been reports of people becoming ill from handling aflatoxin tainted pet foods, the FDA instructs pet owners to wash their hands after handling any pet food and to sanitize with bleach bowls, scoops and other items used that touch the potentially

---

[5] FDA, FDA Alert: Certain Lots of Sportmix Pet Food Recalled for Potentially Fatal Levels of Aflatoxin, https://www.fda.gov/animal-veterinary/outbreaks-and-advisories/fda-alert-certain-lots-sportmix-pet-food-recalled-potentially-fatal-levels-aflatoxin?utm_medium=email&utm_source=govdelivery#products (last visited Jan. 17, 2021) (the "FDA Recall Notice").

[6] Id.

[7] Id.

contaminated pet food.[8] Aflatoxin exposure is associated with an increased risk of liver cancer in humans.[9]

65.    The FDA further warned that pets are highly susceptible to aflatoxin poisoning because they consistently eat the same pet food that can lead to the accumulation of aflatoxin in their bodies.[10]

66.    Under the Federal Food, Drug, and Cosmetic Act ("FDCA"), the FDA is the government agency primarily responsible for making sure that food for both people and animals is safe, properly manufactured, and properly labeled although manufacturers are left much self-regulation. The FDCA, 21 U.S.C. § 342(a)(1), prohibits foods that are adulterated due to poisonous substances. Similarly, state laws prohibit adulteration of pet foods that contain poisonous substances that may render the pet foods injurious to health.[11]

67.    Action levels and tolerances represent limits at or above which the FDA will take legal action to remove products from the market. The FDA action level for aflatoxin in pet food is 20 parts per billion (ppb).[12]

---

[8] *Id.*

[9] National Cancer Institute, https://www.cancer.gov/about-cancer/causes-prevention/risk/substances/aflatoxins, (last visited January 18, 2021).

[10] FDA Recall Notice.

[11] *See, e.g.*, IN Code § 15-19-7-29 (2017) ("A commercial feed is considered adulterated if it meets any of the following conditions: (1) It bears or contains a poisonous or deleterious substance that may render it injurious to health.")

[12] FDA, Guidance for Industry: Action Levels for Poisonous or Deleterious Substances in Human Food and Animal Feed, https://www.fda.gov/regulatory-information/search-fda-guidance-documents/guidance-industry-action-levels-poisonous-or-deleterious-substances-human-food-and-animal-feed#afla (citing CPG 683.100) (FDA action level 20 ppb for aflatoxin in animal feed) (last visited Jan. 17, 2021).

68.     One report stated that veterinarian Dr. David Sikes first brought to light the issue of aflatoxin poisoning after he was notified of a single kennel in southwest Missouri that experienced losing at least 18 dogs and more becoming gravely ill after eating SPORTMiX pet food. He soon also learned about two other kennels in the same region that lost multiple dogs.[13]

69.     Another media report stated that Dr. Sikes' published laboratory test results for affected food samples from the impacted kennels in a closed discussion group for veterinarians. Dr. Sikes' laboratory tests found aflatoxin levels to measure 525 parts per billion (ppb) in one feed bin and 380 (ppb) in the other. The samples were between 19 and 26 times the FDA's threshold limit of 20 ppb.[14]

70.     After the FDA received reports of over 70 dogs that died and more than 80 that were sick after eating SPORTMiX pet food, on January 11, 2021, the FDA and Midwestern expanded the recall to include all pet foods containing corn and manufactured in the company's Oklahoma plant having an expiration date on or before July 9, 2022. The FDA cautioned that the reported number of animal deaths and sickness was approximate, and the FDA continued to follow up with veterinarians and state partners. The FDA numbers did not include animal deaths or sicknesses not reported to the FDA including those reported to Midwestern, which the FDA indicated were not shared with the FDA. The expanded recall included over 1,000 lots of pet foods

---

[13] VIN, Dozens of dogs die after eating tainted kibble, Dec. 31, 2020, https://news.vin.com/default.aspx?pid=210&catId=615&Id=10005010 (last visited Jan. 17, 2021).

[14] The Canine Review, Midwestern Values: How a Pet Food Company Stole Christmas, Jan. 14, 2021, https://thecaninereview.com/2021/01/14/midwestern-values-how-a-pet-food-company-stole-christmas/ (last visited Jan. 17, 2012).

manufactured by Midwestern. The brands involved are SPORTMiX, Pro Pac, Nunn Better, Sportstrail, and Splash Fat Cat.[15]

71.      The FDA indicates that its investigation is continuing and it has teamed up with state departments of agriculture from across the country including Missouri, Oklahoma, Arkansas, Kansas, Kentucky, Louisiana, New Mexico, Oregon, Texas, and Washington.[16]

72.      Midwestern stated in its own press release that a call center staffed with licensed veterinarians had been established for its customers and pet parents who have questions or concerns regarding their pet's health. It also instructs destruction of the Recalled Pet Food in a way that children, pets and wildlife cannot access them, even though Midwestern knows or should know that the food is evidence that should be preserved.[17]

73.      However, Defendant has not indicated any willingness to refund all customer purchases of the Recalled Pet Foods that should not have been sold. Instead, it appears that Defendant is attempting to minimize the number of claimants only to those who contact Defendant to make a claim despite Defendant's press release not even mentioning a claims process, and then to further narrow the number claimants or amount paid to claims to those who can provide substantial evidence to make a successful claim. Defendant's insurance company claim investigator requested among other things: the bag (which many consumers discard after pouring the food into another airtight container), veterinarian bills, veterinary records, autopsy records (which are uncommon for animals), toxicology and blood testing results, permission for Defendant

---

[15] The FDA Recall Notice.

[16] *Id.*

[17] Midwestern Pet Foods, Press Release Jan. 11, 2021, https://midwesternpetfoods.com/wp-content/uploads/2021/01/Press-Release-01-11-2021-MPF-Statement.pdf (last visited Jan. 17, 2021).

to speak with the customer's veterinarian, and age of the dog so that Defendant can investigate whether the dog, despite having eaten poisonous Recalled Pet Foods, could be argued to have died of another cause. Furthermore, Defendant has requested some impacted customers to provide evidence of the product that Defendant publicly told customers to destroy in the Recall notice.

74.     Plaintiffs' experiences were consistent with other consumers who purchased the Recalled Pet Foods and whose pets became ill with symptoms of aflatoxin poisoning.

75.     Plaintiffs and Class members had no reason to know about the health risks to pets consuming the Recalled Pet Foods because Defendant misrepresented that the Recalled Pet Foods were "100% guaranteed for taste and nutrition" and tested to ensure their safety for pets to consume and failed to disclose the risk of aflatoxin poisoning.

76.     Defendant misrepresented the Recalled Pet Foods this way, intending for consumers to rely upon those disclosures, while at the same time declining to be truthful about its inadequate testing for aflatoxin in the Recalled Pet Foods.

77.     Plaintiffs and Class members saw the Recalled Pet Foods prior to purchase. Defendant misrepresented and concealed the material risks to Plaintiffs' and Class members' pets. As a result, Plaintiffs and Class members had no notice of these potential deadly risks.

78.     There was a complete imbalance in the information provided to Plaintiffs and Class members on one hand and what Defendant knew about the Recalled Pet Foods on the other hand.

79.     Meanwhile, because Midwestern did not test the Recalled Pet Foods, the adulterated products were sold to unsuspecting customers containing fatal levels of aflatoxin endangering the lives of their pets. The Recalled Pet Foods were adulterated and should not have

been sold as pet food – let alone represented as "100% guaranteed for taste and nutrition" and tested to ensure pets' health and safety.

## V.      CLASS ACTION ALLEGATIONS

80.      The Class members' claims all derive directly from a uniform course of conduct by Defendant. Specifically, Defendant has engaged in uniform and standardized conduct in not disclosing, concealing, and omitting the serious and dangerous side effects of its medications. The objective facts—Defendant's misrepresentations, failure to disclose, concealment, and omissions—are the same for all Class members. Accordingly, Plaintiffs bring this lawsuit as a class action on their own behalf and on behalf of all other persons similarly situated as members of the proposed Classes pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) and/or (b)(2) and/or (c)(4). This action satisfies all requirements of those provisions, including numerosity, commonality, typicality, adequacy, predominance, and superiority.

### The Nationwide Class

81.      Plaintiffs bring this action and seek to certify and maintain it as a class action under Rules 23(a); (b)(2); and/or (b)(3); and/or (c)(4) of the Federal Rules of Civil Procedure on behalf of themselves and a Nationwide Class defined as follows:

> All purchasers or users of the Recalled Pet Foods products in the United States or its territories between December 30, 2018, and the present.

### The State Subclasses

82.      Additionally, as further described herein, Plaintiffs bring claims based upon state laws on behalf of the following subclasses for the states of New Mexico, Oklahoma, Kansas and Texas (collectively, the "State Subclasses" and, together with the Nationwide Class, the "Class" or "Classes"):

All purchasers or users of the Recalled Pet Foods products in the state of New Mexico between December 30, 2018, and the present (the "New Mexico Subclass").

All purchasers or users of the Recalled Pet Foods products in the state of Oklahoma between December 30, 2018, and the present (the "Oklahoma Subclass").

All purchasers or users of the Recalled Pet Foods products in the state of Kansas between December 30, 2018, and the present (the "Kansas Subclass").

All purchasers or users of the Recalled Pet Foods products in the state of Texas between December 30, 2018, and the present (the "Texas Subclass").

83.    Excluded from the Classes are: (a) any person who purchased the Recalled Pet Foods for resale and not for personal or household use, (b) any person who signed a release of Defendant in exchange for consideration in excess of the cost of the Recalled Pet Foods and any incurred veterinarian expenses, (c) Defendant, including any entity or division in which Defendant has a controlling interest, as well as its agents, representatives, officers, directors, employees, trustees, parents, children, heirs, assigns, and successors, and other persons or entities related to, or affiliated with Defendant, and (d) the Court and its staff, and their immediate families. Plaintiffs reserve the right to modify or amend these Nationwide and Statewide Class definitions as appropriate during the course of this litigation.

84.    **Numerosity**: Federal Rule of Civil Procedure 23(a)(1). The members of the Nationwide Class and State Subclasses are so numerous and geographically dispersed that individual joinder of all Class members is impracticable. While Plaintiffs believe that there are at least thousands of class members, the precise number is unknown to Plaintiffs but may be ascertained from purchase records, sales records, production records, and veterinarian records. Plaintiffs anticipate providing Court-approved, appropriate notice to Class members, to be approved by the Court in accordance with Rule 23 of the Federal Rules of Civil Procedure.

85.    **Commonality and Predominance: Federal Rules of Civil Procedure 23(a)(2) and 23(b)(3)**. This action involves common questions of law and fact, which predominate over any questions affecting individual class members, including, without limitation:

a.    Whether Defendant omitted or otherwise misrepresented the Recalled Pet Foods to Plaintiffs and Class members;

b.    Whether the defective nature of the Recalled Pet Foods constitutes a material fact that reasonable consumers would have considered in deciding whether to purchase the product;

c.    Whether Defendant knew or should have known about the Recalled Pet Foods' safety defect, and, if so, how long Defendant has known of the defect;

d.    Whether Defendant had a duty to disclose the defective nature of the Recalled Pet Foods to Plaintiffs and Class members;

e.    Whether Defendant's conduct tolls any or all applicable limitations periods by acts of fraudulent concealment, application of the discovery rule, or equitable estoppel;

f.    Whether Defendant engaged in unfair, deceptive, unlawful and/or fraudulent acts or practices in trade or commerce by objectively misleading Plaintiffs and putative Class members;

g.    Whether Defendant's conduct, as alleged herein, was likely to mislead a reasonable consumer;

h.    Whether Defendant violated state consumer protection laws, and if so, what remedies are available under those statutes;

i.      Whether Defendant's statements, concealments and omissions regarding the Recalled Pet Foods were material, in that a reasonable consumer could consider them important in purchasing the Recalled Pet Foods;

j.      Whether the Recalled Pet Foods were unfit for the ordinary purposes for which they were used, in violation of the implied warranty of merchantability;

k.      Whether Plaintiffs and the Classes are entitled to a declaratory judgment stating that the Recalled Pet Foods are defective and/or not merchantable;

l.      Whether Defendant's unlawful, unfair, and/or deceptive practices harmed Plaintiffs and the Classes;

m.      What aggregate amounts of statutory penalties are sufficient to punish and deter Defendant and to vindicate statutory and public policy;

n.      Whether, as a result of Defendant's omissions and/or misrepresentations of material facts, Plaintiffs and Class members have suffered an ascertainable loss of monies, property, and/or value; and

o.      Whether Plaintiffs and Class members are entitled to monetary damages and/or other remedies and, if so, the nature of any such relief.

86.      **Typicality: Federal Rule of Civil Procedure 23(a)(3)**. Plaintiffs' claims are typical of other Class members' claims because Plaintiffs were subjected to the same allegedly unlawful conduct and damaged in the same way as Class members. The relief Plaintiffs seek is typical of the relief sought for the absent Class members.

87.      **Adequacy of Representation: Federal Rule of Civil Procedure 23(a)(4).** Plaintiffs are adequate class representatives because their interests do not conflict with the interests of the other members of the Classes they seek to represent, Plaintiffs have retained counsel

competent and experienced in complex class action litigation, and Plaintiffs intend to prosecute this action vigorously. The Class members' interests will be fairly and adequately protected by Plaintiffs and their counsel.

88.    **Declaratory and Injunctive Relief: Federal Rule of Civil Procedure 23(b)(2)**.

The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendant. Such individual actions would create a risk of adjudications that would be dispositive of the interests of other class members and impair their interests. Defendant has acted and/or refused to act on grounds generally applicable to the Classes, making final injunctive relief or corresponding declaratory relief appropriate.

89.    **Superiority: Federal Rule of Civil Procedure 23(b)(3)**. A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be impracticable for Class members to individually seek redress for Defendant's wrongful conduct. Even if the Class members could afford litigation, the court system could not. Because of the relatively small size of the individual Class members' claims (compared to the cost of litigation), it is likely that only a few Class members could afford to seek legal redress for Defendant's misconduct. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision

by a single court. Class treatment of common questions of law and fact would be a superior method to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the courts and the litigants, and will promote consistency and efficiency of adjudication.

<strong>VI.    CLAIMS FOR RELIEF</strong>

<strong>COUNT I</strong><br/>
<strong>BREACH OF EXPRESS WARRANTY</strong><br/>
<em>By All Plaintiffs on Behalf of the Nationwide Class</em>

90.     Plaintiffs reallege and incorporate by reference the preceding paragraphs as if set forth fully herein.

91.     Plaintiffs bring this claim on behalf of the Nationwide Class. In the alternative, Plaintiffs bring this claim on behalf of themselves and on behalf of the State Subclasses, under the laws of the states in which they reside and/or purchased the Recalled Pet Foods. Choice of law issues may be briefed after sufficient discovery.

92.     Defendant constitutes a "merchant" and a "seller" in connection with its sales of the Recalled Pet Foods to Plaintiffs and the Nationwide Class as those terms are defined in the Indiana Commercial Code. Plaintiffs and the Nationwide Class constituted "buyers" as that term is defined in the Indiana Code. The Recalled Pet Foods products constituted "goods" as that term is defined in the Indiana Code. Plaintiffs and Class members could buy the Recalled Pet Foods product directly in the stream of commerce.

93.     Under section Ind. Code § 26-1-2-313, Defendant's statements of affirmations of fact, promises and descriptions made on the Recalled Pet Foods' packaging and advertising, which Defendant provided to Plaintiffs and the Nationwide Class, created written express warranties

before or at the time of purchase, including that the Recalled Pet Foods were "100% guaranteed for taste and nutrition" and were tested to ensure the health and safety for pets to consume.

94.    State warranty laws from the states in which consumers purchased and used the Recalled Pet Foods are substantially similar to Indiana's warranty law concerning the definitions of merchants, sellers, buyers, and goods.

95.    State warranty laws from the states in which consumers purchased and used the Recalled Pet Foods are substantially similar to Indiana's warranty law concerning the creation of promises based upon representations of safety.

96.    These affirmations of facts and promises made by Defendant to Plaintiffs and the Nationwide Class related to the Recalled Pet Foods and became part of the bases of the bargains for the purchase of the Recalled Pet Foods between Class members and Defendant, and thereby created express warranties that the Recalled Pet Foods would conform to those affirmations and promises.

97.    Furthermore, the aforementioned descriptions of the Recalled Pet Foods were part of the bases of the bargains for the purchases of the Recalled Pet Foods between Defendant on the one hand and Plaintiffs and individual members of the Nationwide Class on the other. The descriptions created an express warranty that the goods would conform to those descriptions.

98.    As previously noted, Defendant uniformly misrepresented the nature of the Recalled Pet Foods as "100% guaranteed for taste and nutrition" that were tested for the health and safety of pets without serious health risks. Instead, the Recalled Pet Foods were contaminated with aflatoxin rendering them adulterated and poisonous to pets. The Recalled Pet Foods did not conform to the affirmations, promises, and descriptions previously mentioned, resulting in breaches of the Recalled Pet Foods' express warranties.

99.    Plaintiffs complied with all conditions precedent to filing this breach of warranty claim, including providing notice of the breach of warranty to Defendant, and at least one of the Plaintiffs provided notice on behalf of herself and the Nationwide Class, prior to filing this action. Alternatively, Defendant has been on notice since its announced Recall of its breaches of warranty to Plaintiffs and the Nationwide Class, and Defendant has done nothing to remedy these breaches. Alternatively, notice need not have been given to Defendant, because it had actual notice of its breaches of warranty as to Plaintiffs and the Nationwide Class.

100.    Plaintiffs believed the Recalled Pet Foods products to be "100% guaranteed for taste and nutrition" and to have been tested for the health and safety of pets.

101.    Defendant created representations intending that consumers would rely upon them, and consumers would be reasonable in so relying upon those representations.

102.    Defendant breached its warranties to consumers, because the Recalled Pet Foods products were supposed to be "100% guaranteed for taste and nutrition" and tested to ensure their health and safety, but they contained aflatoxin that rendered them adulterated and unsafe for pets to consume.

103.    Defendant misrepresented the Recalled Pet Foods and did not disclose the safety defects inherent in them.

104.    Defendant has known about the safety issues with its product but elected to omit those safety issues from its materials and representations to consumers. Accordingly, Defendant was already on notice of its breach of warranties.

105.    When consumers—including Plaintiffs and Class members—contacted Defendant to complain about the Recalled Pet Foods and its impact on their pets, Defendant did not return their call and instead at times directed them to an insurance representative or veterinarian, who

demanded extensive information from them while knowing that the Recalled Pet Foods had caused sickness and in some cases death in pets.

106.    Accordingly, providing Defendant with notice is ineffective at providing Defendant an opportunity to cure its breach of warranties. Allowing Defendant additional opportunity to cure its breach of warranties is unnecessary and would be futile here as Plaintiffs have already suffered harm.

107.    As a direct and proximate result of Defendant's breach of express warranties, Plaintiffs and the Nationwide Class have suffered actual damages as follows:

      a.    Compensatory damages amounting to, among other things, the difference in value between the full purchase price of the Recalled Pet Foods and the actual value of it, pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure; and

      b.    Consequential damages pursuant to Rule 23(c)(4) of the Federal Rules of Civil Procedure.

108.    Plaintiffs and the Nationwide Class demand judgment against Defendant for damages, as set forth above, plus interest, costs, and such additional relief as the Court may deem appropriate or to which Plaintiffs and the Nationwide Class may be entitled.

## COUNT II
## BREACH OF IMPLIED WARRANTY
*By All Plaintiffs on Behalf of the Nationwide Class*

109.    Plaintiffs reallege and incorporate by reference the preceding paragraphs as if set forth fully herein.

110.    Plaintiffs bring this claim on behalf of the Nationwide Class. In the alternative, Plaintiffs bring this claim on behalf of themselves and on behalf of the State Subclasses, under the

laws of the states in which they reside and/or purchased the Recalled Pet Foods. Choice of law issues may be briefed after sufficient discovery.

111.    Plaintiffs purchased the Recalled Pet Foods for their pets believing the products to be of good, merchantable quality and safe for use in their pets.

112.    The Recalled Pet Foods is a "good" within the meaning of the Indiana Commercial Code.

113.    Plaintiffs and Class members are buyers as that term is defined by the Indiana Commercial Code. Defendant is a merchant with respect to the Recalled Pet Foods product. Plaintiffs and Class members could purchase the Recalled Pet Foods product directly in the stream of commerce.

114.    Plaintiffs and Class members purchased the Recalled Pet Foods products believing them to be safe to use for their pets. Defendant made an implied warranty with its consumers that the Recalled Pet Foods products would be safe and healthy for pets to consume.

115.    A warranty that the Recalled Pet Foods was in merchantable condition and fit for the ordinary purpose for which it is used is implied by law.

116.    The Recalled Pet Foods, when it was sold and all times thereafter, was not in merchantable condition and not fit for the ordinary purpose for which it was intended—as pet food—given the serious safety risk from inadequate testing and aflatoxin poisoning in the product.

117.    Defendant has known about the safety issues with its product and that it was not merchantable but elected to misrepresent and omit those safety issues from its materials and representations to consumers.

118.    Plaintiffs complied with all conditions precedent to filing this breach of warranty claim, including providing notice of the breach of warranty to Defendant, and at least one of the

Plaintiffs provided notice on behalf of herself and the Nationwide Class, prior to filing this action. Alternatively, Defendant has been on notice since its announced Recall of its breaches of warranty to Plaintiffs and the Nationwide Class, and Defendant has only changed some representations regarding these breaches relating to removing references to testing of its ingredients and pet foods. Alternatively, notice need not have been given to Defendant, because it had actual notice of its breaches of warranty as to Plaintiffs and the Nationwide Class.

119.     When consumers—including Plaintiffs and Class members—contacted Defendant to complain about the Recalled Pet Foods and the impact on their pets, Defendant did not contact them back and in some instances directed them to their insurance company or a veterinarian, who demanded substantial information from them, while knowing that the Recalled Pet Foods has caused sickness and in some cases death of pets.

120.     Accordingly, providing Defendant with notice is ineffective at providing Defendant an opportunity to cure its breach of implied warranties. Allowing Defendant additional opportunity to cure its breach of implied warranties is unnecessary and would be futile here as Plaintiffs have already suffered harm.

121.     As a direct and proximate cause of Defendant's breach of the implied warranty of merchantability, Plaintiffs and Class members suffered injury in an amount to be proven at trial.

## COUNT III
## PRODUCTS LIABILITY
*By All Plaintiffs on Behalf of the Nationwide Class*

122.     Plaintiffs reallege and incorporate by reference the preceding paragraphs as if set forth fully herein.

123.     Plaintiffs bring this cause of action on behalf of the Nationwide Class and, if necessary, State Subclasses based upon the laws in the states in which they treated their pets with

the Recalled Pet Foods. Choice of law principles may be briefed after sufficient discovery takes place.

124.    Defendant designed, manufactured, and sold the Recalled Pet Foods, an unsafe pet food potentially contaminated with poisonous aflatoxin that creates a risk of sickness and death to pets.

125.    The Recalled Pet Foods were not reasonably fit, suitable, or safe for their intended purpose because they were inadequately tested for the safety and health of pets that consume them, were potentially contaminated with poisonous aflatoxin, and failed to warn of this risk.

126.    That the Recalled Pet Foods were risky to the health of animals was, at all times material hereto, an unreasonably dangerous defect and/or condition. The failure of Defendant to warn on the packages of the dangerousness of the Recalled Pet Foods, as well as Defendant's omissions of the defect and misrepresentations regarding its "100% guaranteed for taste and nutrition" pet foods that are tested for health and safety also constituted an unreasonably dangerous defect and/or condition.

127.    These unreasonably dangerous defects and/or conditions existed at the time the Recalled Pet Foods left Defendant's control.

128.    Defendant knew about the dangers the Recalled Pet Foods posed from its inadequate testing for the health and safety of pets that consume them, but elected to misrepresent them and not inform consumers of the risks.

129.    The Recalled Pet Foods came in sealed packages, and its packaging did not change from the time they left Defendant's possession through the time they arrived in stores to be sold to consumers, and consumers purchased and took possession of them.

130.    The unreasonably dangerous defects and/or conditions of the Recalled Pet Foods proximately caused injury and death to animals, constituting property damage to Plaintiffs and certain other members of the Nationwide Class beyond and in addition to the damages from purchasing the mislabeled and worthless Recalled Pet Foods.

131.    Accordingly, Defendant is strictly liable for the damages caused to Plaintiffs and other members of the Nationwide Class, by the unreasonably dangerous Recalled Pet Foods, specifically the illness and deaths of any animals and the expenses incurred therewith.

### COUNT IV
### Strict Liability, Failure to Warn
*By All Plaintiffs on Behalf of the Nationwide Class*

132.    Plaintiffs reallege and incorporate by reference the preceding paragraphs as if set forth fully herein.

133.    Plaintiffs bring this claim on behalf of the Nationwide Class and, if necessary and in the alternative, based upon the laws of the states in which the Recalled Pet Foods were used and purchased by Plaintiffs and Class members. Issues regarding choice of law principles may be briefed after discovery.

134.    At all times relevant hereto, Defendant was the manufacturer of the Recalled Pet Foods, and marketed the product directly to consumers for purchase.

135.    The Recalled Pet Foods were designed, produced, created, made, manufactured, distributed, and sold and placed into the stream of commerce by Defendant.

136.    At the time Defendant sold the Recalled Pet Foods, the warnings and instructions were inadequate and defective. As described herein and below, there was an unreasonable risk that the Recalled Pet Foods would not perform safely and effectively for the purposes for which they

were intended. Defendant failed to design and manufacture against such dangers and failed to provide adequate warnings and instructions concerning these risks.

137.    The Recalled Pet Foods were expected to and did reach the ultimate users, including Plaintiffs and Class members.

138.    Plaintiffs and Class members were unaware of the safety risks associated with the Recalled Pet Foods, because Defendant concealed them.

139.    Defendant's Recalled Pet Foods pose a foreseeable risk of danger when used for their intended purpose. As demonstrated above, when Plaintiffs used the Recalled Pet Foods for their intended purpose, the products severely injured—and in some instances killed—their pets.

140.    Defendant failed to warn consumers that the Recalled Pet Foods posed health and safety risks.

141.    Defendant failed to provide any warning or instruction to Plaintiffs and Class members of the harm that the defects could cause and the defects were present in the Recalled Pet Foods products when they left Defendant's control.

142.    The Recalled Pet Foods were unsafe for normal or reasonably anticipated use.

143.    Plaintiffs and Class members used the Recalled Pet Foods in the manner for which they were intended and/or in a reasonably foreseeable manner.

144.    Plaintiffs and Class members could not, through the exercise of reasonable care, have discovered the defects or perceived the dangers associated with the Recalled Pet Foods.

145.    As a direct and proximate cause of the safety defects, Plaintiffs experienced injury: their pets were harmed and some died.

146.    As a further direct and proximate result of Defendant's Recalled Pet Foods' defect, as described above, Plaintiffs and Class members incurred medical and other related to expenses,

and in some instances may continue to incur such expenses related to additional treatments, medications, and therapies to treat the health issues caused by their pets consuming the Recalled Pet Foods.

147.     As a direct and proximate result of Defendant's actions and the defects present in the Recalled Pet Foods, Plaintiffs and Class members were damaged in amounts to be proven at trial.

**COUNT V**
**Unjust Enrichment**
*By All Plaintiffs on Behalf of the Nationwide Class*

148.     Plaintiffs reallege and incorporate by reference the preceding paragraphs as if set forth fully herein.

149.     To the extent necessary, Plaintiffs bring this claim on behalf of the Nationwide Class in the alternative to their warranty claims.

150.     Defendant received and retained a benefit from Plaintiffs and Class members and inequity has resulted.

151.     Defendant did this in two ways: by selling a product that was unsafe, and by retaining the profits for unused products that can no longer be used.

152.     Defendant benefitted through its unjust conduct, by selling the Recalled Pet Foods to consumers, who can no longer use the product without fearing that they will seriously endanger their pets.

153.     Defendant also benefitted by selling the Recalled Pet Foods products that were unsafe, so they were unable to be used as directed.

154.     Defendant has not offered a refund to consumers for the Recalled Pet Foods, nor has Defendant offered adequate compensation to consumers whose pets ate the Recalled Pet Foods

and became ill or died. Defendant has created a hotline for consumers to speak with veterinarians and a toxicologist about their experience and has directed them to its insurance claims investigator instead – requesting substantial, burdensome documentation.

155.     It is inequitable for Defendant to retain these benefits when Plaintiffs and Class members can no longer use the Recalled Pet Foods without endangering their pets.

156.     Plaintiffs and Class members do not have an adequate remedy at law.

157.     As a result of Defendant's conduct, the amount of its unjust enrichment should be disgorged, in an amount to be proven at trial.

## COUNT VI
### Indiana Deceptive Consumer Sales Act
Ind. Code §§ 24-5-0.5, et seq.
*By All Plaintiffs on Behalf of the Nationwide Class*

158.     Plaintiffs repeat and reallege the allegations contained in the paragraphs above, as if fully set forth herein.

159.     This cause of action is brought pursuant to the Indiana Deceptive Consumer Sales Act, Ind. Code §§ 24-5-0.5, et seq. (the "IDCSA" or the "Act"). The stated purpose of the Act is to "protect consumers from supplies who commit deceptive and unconscionable sales acts" and to "encourage the development of fair consumer sales practices." Ind. Code § 24-5-0.5-1(b).

160.     This cause of action is for damages pursuant to Indiana Code section 24-5-0.5-4(a). Pursuant to the Act, a consumer may bring an action "for the damages actually suffered . . . as a result of the deceptive act or [$500], whichever is greater." Ind. Code § 24-5-0.5-4(a).

161.     Plaintiffs and each member of the Nationwide Class are consumers who purchased the Recalled Pet Foods during the period of Defendant's pervasive false advertising.

162.     Defendant is engaged in trade or commerce within the meaning of the Act.

163.    Indiana Code § 24-5-0.5-2(a)(8) defines "incurable deceptive act" as "a deceptive act done by a supplier as part of a scheme, artifice, or device with intent to defraud or mislead." The wrongs complained of herein are "incurable deceptive acts" as Defendant made misrepresentations regarding the quality and testing of the Recalled Pet Foods in order to mislead consumers into purchasing the Recalled Pet Foods.

164.    Indiana Code § 24-5-0.5-2(a)(7) defines an "uncured deceptive act" as a deceptive act "with respect to which a consumer who has been damaged by such act has given notice to the supplier" and "either: (i) no offer to cure has been made to such consumer within thirty (30) days after such notice; or (ii) the act has not been cured as to such consumer within a reasonable time after the consumers acceptance of the offer to cure." Plaintiffs gave Defendant sufficient notice and an opportunity to cure the misrepresentations and omissions. Defendant has failed to do so.

165.    The IDCSA provides:

A supplier may not commit an unfair, abusive, or deceptive act, omission, or practice in connection with a consumer transaction. Such an act, omission, or practice by a supplier is a violation of this chapter whether it occurs before, during, or after the transaction. An act, omission, or practice prohibited by this section includes both implicit and explicit misrepresentations.

Ind. Code § 24-5-0.5-3(a).

166.    Defendant has violated the Act by engaging in the unfair and deceptive practices described herein, which included carrying out an advertising campaign, directed at Plaintiffs and the Nationwide Class, misrepresenting that the Recalled Pet Foods were "100% guaranteed for taste and nutrition" and were tested for the health and safety of pets who consume them, and failing to disclose the true health and safety risks based on its inadequate testing, which were deceptive, false and misleading. These misrepresentations and omissions offend public policies and are immoral, unethical, unscrupulous, and substantially injurious to consumers.

48

167.    Plaintiffs and the members of the Nationwide Class have been aggrieved by Defendant's unfair and deceptive practices in that they purchased the Recalled Pet Foods that were misrepresented and omitted potential health risks. As a result of Defendant's unfair and deceptive acts, and unlawful conduct, Plaintiffs and the other members of the Nationwide Class have in fact been harmed. If Defendant had disclosed the information discussed above about the Recalled Pet Foods and been otherwise truthful about their safety, Plaintiffs would not have paid as much for the Recalled Pet Foods or would not have purchased them. In fact, Defendant was able to charge more than what the Recalled Pet Foods would have been worth had it disclosed the truth about them. If Defendant properly disclosed the truth about the Recalled Pet Foods including their potential health risks, Plaintiffs would be in a position to determine whether to purchase Defendant's products at the prices offered.

168.    The damages suffered by Plaintiffs and the Nationwide Class were directly and proximately caused by Defendant's unfair and deceptive practices, as more fully described herein.

169.    Prior to the filing of this Complaint, Plaintiffs sent Defendant a notice letter pursuant to Indiana Code section 24-5-0.5-4(a). Plaintiffs sent the letter via certified mail, return receipt requested and email, to Defendant's principal place of business in Evansville, Indiana advising Defendant that it is in violation of the Act and must correct, replace or otherwise rectify the goods and/or services alleged to be in violation of the Act. Defendant was further advised that in the event the relief requested has not been provided within thirty (30) days, Plaintiffs would file their Complaint that would include a request for monetary damages pursuant to the Act. A true and correct copy of Plaintiffs' letter is attached hereto as Exhibit A.

170.    In response, Defendant's insurance company reached out the Plaintiffs' counsel requesting substantial documentation and not providing an offer to cure. After another letter from

Plaintiffs' counsel, Defendants' counsel reached out the Plaintiffs' counsel, but again did not make any offer to cure'. Defendant did not correct, replace, or otherwise rectify the goods and/or services alleged to be in violation of the Act in Plaintiffs' letter. Accordingly, Plaintiffs seek monetary damages pursuant to the Act.

171.    Pursuant to Indiana Code § 24-5-0.5-4(b), Plaintiffs, on behalf of themselves and the Nationwide Class, seek damages, attorneys' fees and costs.

**COUNT VII**
**Kansas Consumer Protection Act,**
**Kan. Stat. Ann. § 50-623 et seq.**
*By Plaintiffs Foote and Lill on Behalf of the Kansas Subclass*

172.    Plaintiffs Foote and Lill ("Kansas Plaintiffs") reallege and incorporate by reference each preceding paragraph as if fully set forth herein.

173.    Kansas Plaintiffs bring this cause of action on their own behalf and on behalf of the members of the Kansas Subclass.

174.    Midwestern is a "supplier" under the Kansas Consumer Protection Act ("Kansas CPA"), Kan. Stat. Ann. § 50-624(l).

175.    Kansas Plaintiffs and the Kansas Subclass Members are "consumers" within the meaning of Kan. Stat. Ann. § 50-624(b).

176.    The sale of the Recalled Pet Foods to the Kansas Subclass members was a "consumer transaction" within the meaning of Kan. Stat. Ann. § 50-624(c).

177.    The Kansas CPA states "[n]o supplier shall engage in any deceptive act or practice in connection with a consumer transaction," Kan. Stat. Ann. § 50-626(a), and that deceptive acts or practices include:

(1) representations made knowingly or with reason to know that the "property or services have sponsorship, approval, accessories, characteristics, ingredients, uses, benefits or quantities they do not have," Kan. Stat. Ann. § 50-626(b)(1)(A);

(2) representations made knowingly or with reason to know that "property or services are of [a] particular standard, quality, grade, style or model, if they are of another which differs materially from the representation," Kan. Stat. Ann. § 50-626(b)(1)(D)

(3) "the willful use, in any oral or written representation, of exaggeration, falsehood, innuendo or ambiguity as to a material fact," Kan. Stat. Ann. § 50-626(b)(2); and

(3) "the willful failure to state a material fact, or the willful concealment, suppression or omission of a material fact," Kan. Stat. Ann. § 50-626(b)(3).

178.    Defendant used or employed deception, fraud, false pretense, false promise, misrepresentation, unfair practice, or the concealment, suppression, or omission of material facts in connection with consumer transactions involving the Recalled Pet Foods, in violation of the Kansas CPA.

179.    Defendant participated in unconscionable practices that violated the Kansas CPA as described below and alleged throughout the Complaint. Specifically, Defendant acted unconscionably by failing to disclose the risk of potential aflatoxin poisoning, by concealing the inadequate testing it was performing, and by marketing the Recalled Pet Foods as "100% guaranteed for taste and nutrition" and tested for the health and safety of pets that consume them.

180.    Defendant knowingly and intentionally misrepresented and omitted material facts in connection with the sale of the Recalled Pet Foods. It systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Recalled Pet Foods in the course of its business.

181.    Defendant also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Recalled Pet Foods.

182.    Defendant's unfair and deceptive acts or practices occurred repeatedly in its trade or business, were capable of deceiving a substantial portion of the purchasing public and imposed a serious safety risk on the public, especially the pets that consumed the Recalled Pet Foods.

183.    Defendant knew that the Recalled Pet Foods were misrepresented as "100% guaranteed for taste and nutrition" and tested to ensure the health and safety of pets that consumed them and instead suffered from inadequate testing that put animals who ate them at risk of aflatoxin poisoning, an inherent defect. Defendant also knew the Recalled Pet Foods were defectively designed or manufactured and were not suitable for their intended use.

184.    Defendant knew or should have known that its conduct violated the Kansas CPA.

185.    Kansas Plaintiffs and the Kansas Subclass members reasonably relied on Defendant's misrepresentations and omissions of material facts in its advertisements of the Recalled Pet Foods and in the purchase of them.

186.    Had Kansas Plaintiffs and the Kansas Subclass Members known that the Recalled Pet Foods were subject to inadequate testing that presented a risk of aflatoxin poisoning they would not have purchased the Recalled Pet Foods or would have paid less for them. Plaintiffs did not receive the benefit of their bargain as a result of Defendant's misconduct.

187.    Defendant owed Kansas Plaintiffs and the Kansas Subclass members a duty to disclose the truth about the Recalled Pet Foods because it:

(a) possessed exclusive knowledge of the design of the Recalled Pet Foods;

(b) intentionally concealed the foregoing from Kansas Plaintiffs and the Kansas Subclass members; and/or

(c) made incomplete representations regarding the quality and health and safety of the Recalled Pet Foods, while purposefully withholding material facts that contradicted these representations from Kansas Plaintiffs and the Kansas Subclass members.

188.    Due to Defendant's specific and superior knowledge that the Recalled Pet Foods were not adequately tested for the health and safety of pets, misrepresentations regarding the "100% guaranteed for taste and nutrition," and reliance by Kansas Plaintiffs and the Kansas Subclass members on these material representations, Defendant had a duty to disclose to Class members that the Recalled Pet Foods presented a health and safety risk to pets that ate them especially from aflatoxin poisoning, and that Class members may incur significant veterinarian expenses and the sickness and/or death of their pets from eating the Recalled Pet Foods. Having volunteered to provide information to Kansas Plaintiffs and the Kansas Sub-Class members, Defendant had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Recalled Pet Foods purchased by Kansas Plaintiffs and the Kansas Subclass Members. The health and safety of pets eating the Recalled Pet Foods are material concerns to Defendant's consumers. Defendant represented to Kansas Plaintiffs and the Kansas Subclass members that they were purchasing pet foods that were fit to be sold, that were "100% guaranteed for taste and nutrition," and that were tested for the health and safety of pets who ate them as alleged throughout this Complaint, when in fact the Recalled Pet Foods were not adequately tested and presented a risk of aflatoxin poisoning.

189.    Kansas Plaintiffs and the Kansas Subclass members suffered injury in fact to a legally protected interest. As a result of Defendant's conduct, Kansas Plaintiffs and the Kansas Subclass members were harmed and suffered actual damages in the form of the costs of purchasing a pet food that should not have been sold and that was not as represented and veterinarian expenses as a result of their pets becoming ill and even dying.

190.    As a direct and proximate result of Defendant's unfair or deceptive acts or practices, Kansas Plaintiffs and the Kansas Subclass members suffered and will continue to suffer injury in fact and/or actual damages.

191.    Defendant's violations present a continuing risk to Kansas Plaintiffs and the Kansas Subclass Members as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

192.    Pursuant to Kan. Stat. Ann. § 50634, Kansas Plaintiffs and the Kansas Subclass seek monetary relief against Defendant measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $10,000 for Kansas Plaintiffs and each Kansas Subclass member.

193.    Kansas Plaintiffs also seek an order enjoining Defendant's unfair, unlawful, deceptive, and/or unconscionable practices, declaratory relief, attorneys' fees, and any other just and proper relief available under Kan. Stat. Ann. § 50-623, et seq.

## COUNT VIII
### New Mexico Unfair Practices Act-Consumer Protection Act
### N. M. Stat. Ann. § 57-12-1 et seq.,
*By Plaintiff Romero on Behalf of the New Mexico Subclass*

194.    Plaintiff Romero realleges and incorporates by reference each preceding paragraph as if fully set forth herein.

195.    Plaintiff Romero is a person as defined in N.M. Stat. Ann. § 57-12-2(A).

196.    Defendant knowingly made false and misleading oral or written statements (or in the exercise of reasonable diligence should have been aware of the false and misleading statement), visual descriptions, or other representations in connection with the sale of goods in the regular course of Defendant's trade, and those statements and representations may tend to or actually deceive or mislead any person. N.M. Stat. Ann. § 57-12-2(D). Specifically:

a)   Defendant caused confusion or misunderstanding as to the source, sponsorship, approval or certification of goods, N.M. Stat. Ann. § 75-12-2(D)(2);

b)   Defendant caused confusion or misunderstanding as to affiliation, connection or association with or certification by another, N.M. Stat. Ann. § 75-12-2(D)(3);

c)   Defendant represented that its goods have sponsorship, approval, characteristics, and benefits that they do not have, N.M. Stat. Ann. § 75-12-2(D)(5);

d)   Defendant represented that goods are of a particular standard, quality or grade or that the goods are of a particular style or model when they are of another, N.M. Stat. Ann. § 75-12-2(D)(7);

e)   Defendant used exaggeration, innuendo or ambiguity as to a material fact or failed to state a material fact when doing so deceives or tends to deceive, N.M. Stat. Ann. § 75-12-2(D)(14); and

f)   Defendant failed to deliver the quality of goods contracted for, N.M. Stat. Ann. § 75-12-2(D)(17).

197.    Defendant engaged in unconscionable trade practices in connection with the sale of goods by:

a) taking advantage of the lack of knowledge, ability, experience or capacity of Plaintiff Romero and members of the New Mexico Subclass to a grossly unfair degree, N.M. Stat. Ann. § 75-12-2(E)(1); or

b) resulting in a gross disparity between the value received by Plaintiff Romero and the New Mexico Subclass and the price paid, N.M. Stat. Ann. § 75-12-2(E)(2).

198.    Defendant willingly engaged in these practices.

199.    Defendant intentionally and knowingly misrepresented the Recalled Pet Foods and knew or should have known that its conduct violated the N.M. Unfair Practices Act.

200.    Defendant owed Plaintiff Romero and members of the New Mexico Subclass a duty to disclose all material facts concerning the Recalled Pet Foods because it had exclusive knowledge about the Recalled Pet Foods, including the testing it was conducting to ensure the health and safety of pets that consumed them and the "100% guaranteed for taste and nutrition."

201.    Defendant's misrepresentations and omissions caused damages to Plaintiff Romero and members of the New Mexico Subclass in an amount to be determined at trial.

202.    Plaintiff Romero the New Mexico Subclass have suffered lost money and property as a result of Defendant's unlawful practices.

203.    Plaintiff Romero and the New Mexico Subclass also seek treble damages, injunctive relief, costs and attorneys' fees and any other proper relief under the N.M. Unfair Practices Act.

### COUNT VIII
**Violation of New Mexico's False Advertising Law**
**§ 57-15-1 et seq.,**
*By Plaintiff Romero on Behalf of the New Mexico Subclass*

204.    Plaintiff Romero realleges and incorporates by reference each preceding paragraph as if fully set forth herein.

205.    Plaintiff Romero is a private citizen and initiates this action on her behalf and all others similarly situated.

206.    Defendant has violated N.M. Stat. Ann. § 57-15-1 *et seq.* by falsely advertising the Recalled Pet Foods in the conduct of a business, trade, or commerce within the state of New Mexico.

207.    The advertising, including labeling, of the Recalled Pet Foods was and is misleading in material respects.

208.    The advertising of the Recalled Pet Foods, including its packaging, failed to reveal facts material in the light of such representations with respect to the commodity to which the advertising relates under the conditions prescribed in said advertisement, or under such conditions as are customary or usual.

209.    Defendant willfully engaged in this false advertising.

210.    This is an exceptional case in which the Defendant has willfully engaged in false advertising, thus making an award of costs or attorneys' fees an appropriate remedy. N.M. Stat. Ann. § 57-15-5.

## COUNT IX
### Oklahoma Consumer Protection Act,
### Okla. Stat. Tit. 15, §§ 751, et seq.
*By Plaintiff Starnes on Behalf of the Oklahoma Subclass*

211.    Plaintiff Starnes realleges and incorporates by reference each preceding paragraph as if fully set forth herein.

212.    Defendant is a "person," as meant by 15 Okla. Stat. § 752(1).

213.    Defendant's advertisements, offers of sales, sales, and distribution of goods, services, and other things of value constituted "consumer transactions" as meant by 15 Okla. Stat. § 752(2).

214.    Defendant, in the course of its business, engaged in unlawful practices in violation of 15 Okla. Stat. § 753, including the following:

a) making false representations, knowingly or with reason to know, as to the characteristics, uses, and benefits of the subjects of its consumer transactions, in violation of 15 Okla. Stat. § 753(5);

b) representing, knowingly or with reason to know, that the subjects of its consumer transactions were of a particular standard when they were of another, in violation of 15 Okla. Stat. § 753(7);

c) advertising, knowingly or with reason to know, the subjects of its consumer transactions with intent not to sell as advertised, in violation of 15 Okla. Stat. § 753 (8);

d) committing unfair trade practices that offend established public policy and was immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers as defined by § 752(14), in violation of 15 Okla. Stat. § 753(20); and

e) committing deceptive trade practices that deceived or could reasonably be expected to deceive or mislead a person to the detriment of that person as defined by § 752(13), in violation of 15 Okla. Stat. § 753(20).

215.    Defendant's representations and omissions were material because they were likely to deceive reasonable consumers.

216.    Defendant intended to mislead Plaintiff Starnes and Oklahoma Subclass members and induce them to rely on their misrepresentations and omissions.

217.    Had Defendant disclosed to Plaintiff Starnes and Oklahoma Subclass members that it misrepresented the Recalled Pet Foods, omitted material information regarding the defects

(including health and safety risks as alleged herein), and was otherwise engaged in deceptive, common business practices, Defendant would have been unable to continue in business and would have been forced to disclose the truth and uniform defects in the Recalled Pet Foods. Instead, Defendant misrepresented that the Recalled Pet Foods were "100% guaranteed for taste and nutrition" and were tested to ensure their health and safety for pets that consume them and omitted the safety risk of potential aflatoxin poisoning. Plaintiff and the Oklahoma Subclass members acted reasonably in relying on Defendant's misrepresentations and omissions, the truth of which they could not have discovered.

218.    The above unlawful practices and acts by Defendant were immoral, unethical, oppressive, unscrupulous, and substantially injurious. These acts caused substantial injury to Plaintiff Starnes and Oklahoma Subclass members.

219.    Defendant acted intentionally, knowingly, and maliciously to violate Oklahoma's Consumer Protection Act, and recklessly disregarded Plaintiff Starnes and Oklahoma Subclass members' rights. Defendant's knowledge of the Recalled Pet Foods' abilities and health and safety risks put Defendant on notice that the Recalled Pet Foods were not as they advertised.

220.    As a direct and proximate result of Defendant's deceptive acts and practices, Plaintiff Starnes and Oklahoma Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the Recalled Pet Foods, and the expense of veterinarian treatment for their pets that became ill or died after eating the Recalled Pet Foods that were adulterated with aflatoxin.

221.     Plaintiff Starnes and Oklahoma Subclass members seek all monetary and non-monetary relief allowed by law, including actual damages, civil penalties, and attorneys' fees and costs.

## COUNT X
### Texas Trade Deceptive Practices–Consumer Protection Act,
### Texas Bus. & Com. Code §§ 17.41, *et seq.*
*By Plaintiff Fabela on Behalf of the Texas Subclass*

222.     Plaintiff Fabela realleges and incorporates by reference the preceding paragraphs as if set forth fully herein.

223.     Plaintiff Fabela brings this claim individually and on behalf of the Texas Subclass.

224.     Defendant is a "person" as defined by Tex. Bus. & Com. Code § 17.45(3).

225.     Plaintiff Fabela and the Texas Subclass members are "consumers" as defined by Tex. Bus. & Com. Code § 17.45(4).

226.     Defendant advertised, ordered or sold goods or services in Texas and engaged in trade or commerce directly or indirectly affecting the people of Texas, as defined by Tex. Bus. & Com. Code § 17.45(6).

227.     Defendant engaged in false, misleading or deceptive acts and practices, in violation of Tex. Bus. & Com. Code § 17.46(b), including misrepresenting that the Recalled Pet Foods were "100% guaranteed for taste and nutrition" and were tested to ensure the safety and health of pets who consumed them. Instead, Defendant omitted that the Recalled Pet Foods were not tested and may contain potentially fatal levels of aflatoxin that could impact the health and well-being of Plaintiff Fabela's and Texas Subclass members' pets and failed to make adequate disclosures to allow consumers to understand the nature the risk of the Recalled Pet Food to their pets.

228.    Defendant's representations and omissions were material because they were likely to deceive reasonable consumers.

229.    Defendant's representations and omissions were uniform; Defendant engaged in a concerted effort to ensure that Plaintiff Fabela and Texas Subclass members believed the Recalled Pet Foods were "100% guaranteed for taste and nutrition" and were tested to be safe and healthy for pets. Defendant's misrepresentations were also uniform because they contained no disclosures relating to the serious health and safety defects of the Recalled Pet Foods, thus not allowing a consumer to make an informed decision when purchasing the product.

230.    Had Defendant disclosed to Plaintiff Fabela and the Texas Subclass members that it misrepresented the quality and testing of the Recalled Pet Foods, omitted material information regarding defects (including health and safety risks as alleged herein), and was otherwise engaged in deceptive, common business practices, Defendant would have been unable to continue in business and would have been forced to disclose the truth and uniform defects in the Recalled Pet Foods. Instead, Defendant misrepresented and omitted the known safety risks of the Recalled Pet Foods.

231.    Plaintiff Fabela and Texas Subclass members acted reasonably in relying on Defendant's misrepresentations and omissions, the truth of which they could not have discovered.

232.    Defendant's duty to disclose the true safety risks of the Recalled Pet Foods arose from its possession of exclusive knowledge regarding the defects in the Recalled Pet Foods and its incomplete representations about the Recalled Pet Foods.

233.    Defendant engaged in unconscionable actions or courses of conduct, in violation of Tex. Bus. & Com. Code Ann. § 17.50(a)(3). Defendant engaged in acts or practices which, to

consumers' detriment, took advantage of consumers' lack of knowledge, ability, experience or capacity to a grossly unfair degree.

234.    Consumers, including Plaintiff Fabela and Texas Subclass members, lacked knowledge about the business practices, omissions, and misrepresentations because this information was known exclusively by Defendant.

235.    Defendant took advantage of consumers' lack of knowledge, ability, experience, or capacity to a grossly unfair degree, with reckless disregard of the unfairness that would result. The unfairness resulting from Defendant's conduct is noticeable, flagrant, complete, and unmitigated.

236.    Defendant recklessly disregarded Plaintiff Fabela and the Texas Subclass members' rights. Defendant's knowledge of the Recalled Pet Foods's true safety risks put Defendant on notice that the Recalled Pet Foods were less safe than advertised.

237.    As a direct and proximate result of Defendant's deceptive acts and practices, Plaintiff and Texas Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the Recalled Pet Foods, increased time and expense in treating any damages caused by the Recalled Pet Foods, and the inability to use the Recalled Pet Foods for their intended purpose without endangering the health and safety of their pets.

238.    Defendant received notice pursuant to Tex. Bus. & Com. Code Ann. § 17.505 concerning its wrongful conduct as alleged herein by Plaintiff and the Texas Subclass members.

239.    However, sending pre-suit notice pursuant to Tex. Bus. & Com. Code Ann. § 17.505 is an exercise in futility for Plaintiff Fabela and members of the Texas Subclass, as

Defendant has already been informed of the allegedly unfair and unlawful conduct as described herein as of the date of the Plaintiff Romero's letter and her Counsel's subsequent discussions with Defendant, and has yet to offer any remedy.

240.    Plaintiff Fabela and members of the Texas Subclass seek all monetary and non-monetary relief allowed by law, including economic damages, damages for mental anguish, treble damages for each act committed intentionally or knowingly, court costs, reasonable and necessary attorneys' fees, injunctive and declaratory relief, and any other relief which the court deems proper.

## VII.    <u>REQUEST FOR RELIEF</u>

WHEREFORE, Plaintiffs, individually and on behalf of all other Class members, respectfully requests that the Court enter judgment in their favor and against Defendant as follows:

a.    Certifying the Class and Subclasses as requested herein, designating Plaintiffs as Class Representatives, and appointing the undersigned counsel as Class Counsel;

b.    Declaring that Defendant is financially responsible for notifying the Class members of the pendency of this suit;

c.    Awarding actual (*e.g.*, compensatory and consequential) and/or statutory damages (including exemplary or punitive damages) to the maximum extent allowed in an amount to be proven at trial;

d.    Requiring restitution and disgorgement of all profits and unjust enrichment Defendant obtained from Plaintiffs and the other Class members as a result of Defendant's unlawful, unfair, and/or fraudulent business practices;

e.    Awarding injunctive relief as permitted by law or equity, including enjoining Defendant from continuing its unlawful practices as set forth herein, and ordering Defendant to engage in a corrective advertising campaign;

f.    Awarding Plaintiffs their reasonable attorneys' fees, costs, and expenses;

g.    Awarding pre- and post-judgment interest on any amounts awarded; and

h.    Awarding such other and further relief as may be just and proper.

## VIII.    <u>JURY DEMAND</u>

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: January 19, 2021

Respectfully submitted,

*s/ Lynn A. Toops*
Lynn A. Toops
Lisa M. La Fornara
**COHEN & MALAD, LLP**
One Indiana Square, Suite 1400
Indianapolis, Indiana 46204
Telephone: (317) 636-6481
ltoops@cohenandmalad.com
llafornara@cohenandmalad.com

Jessica J. Sleater*
**ANDERSEN SLEATER SIANNI LLC**
1250 Broadway, 27th Floor New
York, New York 10001
Telephone: (646) 599-9848
jessica@andersensleater.com

Gretchen Elsner*
**ELSNER LAW & POLICY, LLC**
314 South Guadalupe Street
Santa Fe, New Mexico 87501
Telephone: (505) 303-0980
Gretchen@ElsnerLaw.org

*\* pro hac vice application to be submitted*

***Counsel for Plaintiffs and the Proposed Classes***